IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MICHELLE WILLIAMSON, individually and on behalf of all others similarly situated, | : : : : | Case No. |
| Plaintiff, | : : : | JURY TRIAL DEMANDED |
| v. | : : | |
| GRADY MEMORIAL HOSPITAL CORPORATION | : : : | |
| Defendant. | : | |

## CLASS ACTION COMPLAINT

Plaintiff Michelle Williamson ("Plaintiff or "Williamson") brings this class action lawsuit in her individual capacity and on behalf of all others similarly situated against Grady Memorial Hospital Corporation ("Grady" or "Defendant") and alleges, upon personal knowledge as to her own actions, her counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society.  The mishandling of such information can have serious consequences, including, but certainly not limited to,

1

discrimination in the workplace and/or denial of insurance coverage.[1]

2.    Simply put, if people do not trust that their sensitive, private information will be kept private, they are less likely to seek medical treatment, which can lead to much more serious health consequences down the road. In addition, protecting medical information and ensuring it is kept confidential and not disclosed to anyone other than the person's medical providers is vitally necessary to maintain public trust in the healthcare system as a whole.

3.    Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique identifying code that can connect the individual to the collecting entity.

4.    As detailed below, Defendant's illegal and widespread practice of disclosing Plaintiff's and putative Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI" and,

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022) https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Tood Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

collectively with PII, "Private Information") to third parties, including, but not necessarily limited to Google, LLC ("Google") is an ongoing harm to its users and the healthcare system as a whole.

**Grady Collects Vast Troves of Private Information**

5.     Grady controls and maintains a website, *https://www.gradyhealth.org/* (the "Website"), where it encourages patients to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes and more.

6.     Plaintiff and members of the putative class ("Class Members" and, with Plaintiff, "Users" and, each, a "User") who visited and used Defendant's Website understandably thought they were communicating *only* with their trusted healthcare providers.

7.     Unbeknownst to Plaintiff and the Class Members, however, Grady embedded various third-parties' tracking technologies on its Website, including but not limited to, Google DoubleClick and Google Analytics (collectively, "Tracking Tools"). The Tracking Tools automatically transmit to third parties every click, keystroke and detail about Users' medical treatment.

8.     Operating as designed and as implemented by Grady, the Tracking Tools allow the Private Information that Plaintiff and Class Members provide to

Grady to be unlawfully disclosed to third parties, like Google.

9.      The Private Information Grady sends to third parties is also linked to Users' unique IP address or other identifiable user profiles created by the Tracking Tools.

10.     Tracking Tools are snippets of code embedded on a website (or other digital platform) that surveil and record a User's identity and activity, such as how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box), among other things.

11.     The User's web browser executes the Tracking Tool via instructions within the webpage to communicate certain information based on parameters selected by the website's owner. Tracking Tools are customizable and programmable, meaning that the website owner controls which of its web pages contain the Tracking Tools and which events are tracked and transmitted to third parties.

12.     By installing Tracking Tools, Grady effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to unknowingly disclose their private, sensitive, and confidential health-related communications with Grady to third parties.

13.     Defendant utilized Tracking Tools for marketing purposes to bolster its

4

profits; that is, despite its duty to maintain the privacy of its Users' Private Information, Grady put its own desire for profit over the privacy rights of its patients.

14. Tracking Tools are routinely used to target specific customers by utilizing data to build incredibly fulsome and robust profiles for the purposes of retargeting and future marketing. Third parties use Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other Private Information disclosed to Grady.

15. The information that Grady's Tracking Tools sent to third parties included the Private Information that Plaintiff and Class Members submitted to Defendant's Website, including, for example, patient status, medical conditions searched by Users', names of providers whose profile pages were viewed by the Users, when Users click to sign in to the patient portal, when Users click to refill a prescription, when Users click to pay a bill, facility locations selected or searched by Users, User's free-text searches made via the search bar, when Users click to call their provider, Users' appointment scheduling and every page URL the User visited on the website. This information was transmitted to third parties alongside Users' personal identifiers, including IP addresses and unique cookie identifiers associated with Google and other third-party tracking technologies.

16. The information described in the preceding paragraph allows a third party (*e.g.*, Google) to learn and record that a specific patient sought confidential

medical care. Third parties, in turn, sell Plaintiff's and Class Members' Private Information to fourth-party marketers who geo-target Users based on communications obtained via the Tracking Tools.

17.    Google and third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data sent by Grady's Tracking Tools that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia or HIV.

**Grady's Disclosure of Users' Private Information**
**Without Consent Violates the Law**

18.    Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information collected via its web pages to an undisclosed third party without the patients' informed and express consent.

19.    Neither Plaintiff nor any other Class Members were provided, much less signed, a written authorization permitting Grady to disclose their Private Information to third parties.

20.    Despite willfully and intentionally incorporating the Tracking Tools into its Website and servers, Grady never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private

Information with third parties.[2]

21.    Grady's overall intent and purpose in acquiring Users' Private Information was to increase its ability to market and retarget its Users, thereby increasing its profit while violating federal statutes and other laws.

22.    Plaintiff and the Class Members were unaware that their Private Information was being surreptitiously transmitted to third parties as they communicated with their healthcare providers via Grady's Website or that their information was stored on Grady's servers to be later transmitted to third parties so it could be used for targeted advertising and marketing purposes.

23.    As detailed below, Grady owed statutory, regulatory, and contractual duties to keep Plaintiff's and Class Members' communications and medical information safe, secure and confidential.

24.    The disclosure of Plaintiff's and Class Members' Private Information

---

[2] In contrast to Defendant, several medical providers have notified their patients of the fact that similar tracking technologies disclosed Private Information to third parties. *See, e.g., Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf; *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022)https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health 1.36 Million Patients About Unauthorized Disclosure of PHI via Meta Pixel Code on Patient Portal* (Aug. 16, 2022), https://www.hipaajournal.com/novant-health-notifies-patients-about-unauthorized-disclosure-of-phi-via-meta-pixel-code-on-patient-portal/.

via the Tracking Tools contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Pursuant to HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule"), which governs how health care providers must safeguard and protect Private Information.

25.    Pursuant to the Privacy Rule, covered entities such as Grady are ***not*** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent from each patient.

26.    Lest there be any doubt of the illegal nature of Grady's practice, the Office for Civil Rights ("OCR") at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "Bulletin"), that the unlawful transmission of such protected information violates the Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes,***

> ***without individuals' HIPAA-compliant authorizations,
> would constitute impermissible disclosures.***[3]

27.    The HHS Bulletin does not change any existing rule or impose any new obligation on HIPAA-covered entities. Instead, it reminds these entities of their long-standing obligations by referring to guidance and rules that have been in place for decades. *Id.* ("it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors").

28.    In contrast to Grady, several medical providers that used Tracking Tools in a similar way have provided their patients with notice that their Private Information was transmitted to third parties.[4]

29.    Grady, moreover, made express promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

---

[3] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited May 12, 2026) (emphasis added).

[4] *See supra* n.2.

30.     Grady breached its statutory, regulatory and contractual obligations to Plaintiff and Class Members by, *inter alia*: (i) failing to adequately review its marketing programs and web based technologies to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share Users' Private Information; (iii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Google and other third parties; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools; (v) failing to warn Plaintiff and Class Members of sharing their Private Information with third parties and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality, security and integrity of patient Private Information.

31.     As a result, Plaintiff and Class Members suffered injury and are entitled to relief, including statutory damages, any profits made by Grady as a result of the violations, restitution and disgorgement of benefits Grady unjustly obtained, and injunctive relief to prevent continued unauthorized disclosures of their Private Information.

32.     Plaintiff therefore seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and assert statutory claims against Grady for: (i) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*, and (ii) unjust enrichment.

10

**PARTIES**

33.    Plaintiff Michelle Williamson is a natural person and a citizen of the State of Georgia. Ms. Williamson has been a patient of Grady since at least 2010 and has maintained a Google account since at least 2012. During the relevant time period, Ms. Williamson has used the Grady Website to schedule appointments, request information on specific medical services, research providers and locations, and login to the MyChart patient portal. By doing so, Ms. Williamson's individually identifiable health information was disclosed to third parties under the systematic process described above. Ms. Williamson had no knowledge her sensitive medical information was shared with Google or other third parties and gave no consent or authorization for Grady to use her individually identifiable health information.

34.    Grady Memorial Hospital Corporation is a nonprofit healthcare system headquartered in Atlanta, Georgia, Fulton County, serving patients throughout the Atlanta region. Grady encompasses 16 facilities, including inpatient and outpatient care centers providing a wide range of services including behavioral health, cancer treatment, trauma and emergency care, and other advanced medical services.

35.    Grady is a covered entity under HIPAA.

**JURISDICTION AND VENUE**

36.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, specifically the Electronic Communications

11

Privacy Act, 18 U.S.C. § 2510, *et seq*. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged form part of the same case or controversy.

37.    This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), which expressly provides federal courts with jurisdiction over any class action in which: the proposed class includes at least 100 members; any member of the class is a citizen of a state and any defendant is a citizen or subject of a foreign state; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

38.    This Court has personal jurisdiction over Grady because it operates and maintains its principal place of business in this District. Further, Grady is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and management of its Website in this District, including decisions regarding the privacy of Users' Private Information and the incorporation of Tracking Tools.

39.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in, and is subject to, personal jurisdiction in this District. Venue is also proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in, and emanated from, this District.

**COMMON FACTUAL ALLEGATIONS**

A.    **Background: The Use of Tracking Technologies in the Healthcare Industry.**

40.    Tracking Tools installed on many hospitals', telehealth companies' and other healthcare providers' websites (and other digital properties) are collecting patients' and other visitors' confidential and private health information—including details about their medical conditions, prescriptions and appointments, among many other things—and sending that information to third-party vendors without prior, informed consent.

41.    These Tracking Tools are snippets of code that track users as they navigate through a website, logging which pages they visit, which buttons they click, and additional information they enter into forms. In exchange for installing the Tracking Tools, the third-party platforms (*e.g.,* Facebook and Google) provide website owners with analytics about the advertisements they have placed as well as tools to target people who have visited their websites.

42.    While the information captured and disclosed without permission may vary depending on the Tracking Tools embedded, these "data packets" can be extensive, sending, for example, not just the name of the physician and her field of medicine, but also the first name, last name, email address, phone number, zip code and city of residence entered into a booking form.

43.    The data set forth in the preceding paragraph is linked to a specific

internet protocol ("IP") address and several forms of unique identifier cookies. These cookies enable third-party vendors like Google to create a comprehensive user profile by connecting web activity to an existing account or, even if the User is not signed into such accounts, to another unique user profile.

44.     IP addresses are considered PHI when connected to treatment records or other protected information under HIPAA.[5]

45.     Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to surreptitiously capture and to disclose their Users' personal health information.

46.     Specifically, and for example, *The Markup* reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Meta a packet of data whenever a person clicked a button to schedule a doctor's appointment.[6]

**B.     Grady Installed and Utilized Tracking Technology for the Purpose of Disclosing Plaintiff's and Class Members' Private Information to Third Parties.**

47.     Grady purposely installed Tracking Tools including but not limited to Google's DoubleClick and Google Analytics tools on its Website and programmed

---

[5] *See Use of Online Tracking Technologies by HIPAA, supra*, note 3.
[6] *See supra* n.1.

the Website to surreptitiously share its patients' private and protected communications with third parties, including communications containing Plaintiff's and Class Members' Private Information.

48.     On numerous occasions, with the most recent in March 2026, Plaintiff Michelle Williamson accessed Grady's Website on her computer and used the Website to schedule appointments, request information on specific medical services, and research providers, and review financial assistance resources.

49.     Grady assisted third party vendors with intercepting Williamson's communications, including those containing Private Information.

50.     Grady assisted these interceptions without Williamson's knowledge, consent or express written authorization. By failing to receive the requisite consent, Grady breached its duties of confidentiality and unlawfully disclosed Williamson's Private Information.

**C.     Google's Tracking Tools, Including Google DoubleClick and Google Analytics.**

51.     By many measures, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google

15

Doubleclick and Google AdWords.

52. Grady deploys Google Doubleclick and Google Analytics tracking tools on its Website.

53. Google Doubleclick is a third-party advertising service that tracks users across the Internet using personally identifiable data and communications to place targeted advertisements.

54. Grady uses various means of identification, including cookies, to help Google Doubleclick acquire and record Users' data and the content of their communications without their knowledge, action, authorization, or consent.

55. The cookies and identifiers used by Grady's Website that enable Google DoubleClick and Google Ads to acquire and record patient communications and patient-identifying information include, as discussed above, the cookies named IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, each of which functions as a persistent personal identifier when received by Google and is used by Google's advertising and analytics systems to associate user activity—including the patient communications transmitted to Grady—with Google's existing user and device profiles.

56. Grady installed Google's Tracking Tools, including Google DoubleClick, as well as other tracking technologies, on many (if not all) of the webpages within its Website and programmed or permitted those webpages to

surreptitiously share patients' private and protected communications with Google—communications that included Plaintiff's and Class Members' Private Information.

57.    Plaintiff's and Class Members' Private Information would not have been disclosed to Google via the Google Tracking Tools but for Grady's decision to install and implement those tools.

58.    By installing and implementing Google Tracking Tools, Grady caused Plaintiff's and Class Members' communications to be intercepted and transmitted to Google via the Tracking Tools.

66.    While Defendant's patients navigate Grady's Website, the Website provides Google with their IP addresses and/or device IDs and the other information they input into Defendant's Website, including not only their medical searches, names of providers whose profile pages were viewed by the patient, appointment requests, when patients click to sign in on the patient portal, click to pay a bill, click to refill a prescription, any free-text searches made by patients, every page a patient visited and when patients click a provider's phone number to call for an appointment.

67.    This is precisely the type of identifying information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients.[7] Plaintiff's and Class Members identities can be easily determined based on IP

---

[7]See https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited May 12, 2026).

17

address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

68. Google advertising technologies do not operate anonymously. Google expressly confirms that cookies may be used in conjunction with other advertising technologies and that server logs include identifiers that distinguish and, when a user is signed-in, may uniquely identify a user. Google states that in the context of advertising "we store a record of the ads we serve in our logs," and that those logs "typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you."[8]

69. Google's tracking ecosystem uses cookies that are personally identifying to Google. Google explains that "cookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google Account ID and most recent sign-in time."[9]

70. Google also uses advertising cookies to target and deliver ads, including across non-Google sites. Google states: "The 'IDE' cookie is used to show Google

---

[8] Google, Advertising & Measurement Technologies, *https://policies.google.com/technologies/ads* (last visited May 12, 2026).

[9] Google, How Google Uses Cookies & Similar Technologies, *https://policies.google.com/technologies/cookies?hl=en-US* (last visited May 12, 2026).

ads on non-Google sites," and that "The 'NID' cookie can be used to show ads in Google services for signed-out users." In addition, Google explains that "the 'DSID' cookie is used to identify a signed-in user on non-Google sites," confirming that Google can recognize a logged-in user even while that user browses a third-party website.[10]

71.    The Private Information disclosed via the Tracking Tools allow Google to know that a specific patient is seeking confidential medical care and the type of medical care being sought. Google then uses that information to sell advertising to Grady and other advertisers and/or sells that information to marketers who use it to online target Plaintiff and Class Members.

72.    The third parties that receive information from the Google Tracking Tools and/or user data and communications for their own marketing purposes and for the marketing purposes of the website owner. Ultimately, the purpose of collecting user data is to make money.

73.    Thus, without any knowledge, authorization or action by a user, website owners like Grady use embedded tracking code to commandeer the user's computing device, causing the device to contemporaneously and surreptitiously re-direct the users' communications to third parties, including but not limited to Google.

---

[10] *Id.*

19

74. In this case, Grady employed the Google Tracking Tools described above to intercept, duplicate and re-direct Plaintiff's and Class Members' Private Information to third parties.

75. In sum, the Google Tracking Tools on the Website transmitted Plaintiff's and Class Members' highly sensitive communications and Private Information to third parties, which communications contained private and confidential medical information.

76. As explained below, these unlawful transmissions are initiated by Grady's source code concurrent with communications made via the Website.

**D.    Defendant's Method of Transmitting Plaintiff's and Class Members' Private Information via the Tracking Tools.**

77. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (such as computer, tablet or smartphone) accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser and Microsoft's Edge browser).

78. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

79.     Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

● **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

● **Cookies**: a small text file that can be used to store information on the client device, which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

● **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[11]

81.     A patient's HTTP Request essentially asks Grady's Website to retrieve certain information (such as a physician's "Request an Appointment" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen as they navigate the Website).

---

[11] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

82.     Every website consists of Markup and "Client-Side Code."

83.     Client-Side Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

84.     Client-Side Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

85.     Defendant's Tracking Tools consist of embedded third-party JavaScript that does just that. A Tracking Tool acts much like a traditional wiretap by surreptitiously transmitting a Website User's communications and inputs to third parties.

86.     When patients visit Defendant's Website via an HTTP Request to Grady's server, Defendant's server sends an HTTP Response (including the Markup) that displays the webpage visible to the user, along with Client-Side Code (including Grady's Tracking Tools).

87.     Thus, Grady is, in essence, handing patients a tapped device and once the webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the webpage to trigger the Tracking Tools, which intercept those communications — intended only for Grady — and transmits those communications to third-parties, including but not limited to Google.

88.     Third parties, like Google, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can uniquely identify the patient associated with the personal information intercepted (in this case, highly sensitive Private Information).

89.     The third parties to whom a website transmits data through Tracking Tools are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.*, to bolster profits).

90.     Thus, without any knowledge, authorization, or action by a user, a website owner like Grady can use its Tracking Tools to commandeer a User's computing device, causing the device to contemporaneously and invisibly redirect the Users' communications to third parties.

91.     In this case, Grady employed the Tracking Tools to intercept, duplicate and redirect Plaintiff's and Class Members' Private Information to third parties.

92.     Anyone who visits Grady's Website is presented with a search bar and buttons that provide the following options: "Get Care Now", "Find a Doctor", and "Find a Location". Following that, patients can click to view a doctor's profile, which includes information about that doctor and patient reviews. From that page, patients can click to call for an appointment.

93.     For example, as shown in Figure 1 below, if a patient clicks "Find a

Doctor," and searches for "cancer" from the "Name, Condition/Treatment" search bar, they will receive a list of links to featured pages and related providers, among other links. From here, a patient can click on a relevant provider's page, call the provider, or log in to MyChart to schedule an appointment. At every stage, Tracking Tools implemented in the Defendant's source code automatically tracks and transmits Users' communications, contemporaneously and without the Users' knowledge.



*Figure 1: Search results for "cancer" in "Name, Condition/Treatment" bar*

94.     Figure 2 depicts the tracking activity that occurs when a user searches for "cancer" using the "Name, Condition/Treatment" search feature shown in Figure 1. At that time, Tracking Tools embedded in Defendant's source code record and transmit information reflecting the user's search term and interaction with the search function, along with associated unique identifiers, to Google for analytics and

advertising purposes.



| | |
|---|---|
| sr | 633x866 |
| uaa | |
| uab | 64 |
| uafvl | Chromium;148.0.7778.98|Google%20Chrome;148.0.7778.98|Not%2FA)Brand;99.0.0.0 |
| uam | Nexus 5 |
| uamb | 1 |
| uap | Android |
| uapv | 6.0 |
| uaw | 0 |
| ul | en-us |
| _s | 4 |
| tag_exp | 0~115938465~115938468~118167294 |
| sid | 1778791439 |
| sct | 5 |
| seg | 1 |
| dl | https://www.gradyhealth.org/doctors/?query=cancer |
| dr | https://www.gradyhealth.org/ |
| dt | Find a Doctor | Grady Health |
| en | component_link_click |
| ep.event_category | find-a-doctor |
| ep.event_action | click |
| ep.event_label | Search |
| ep.page_url | https://www.gradyhealth.org/doctors/?query=cancer |
| _et | 29 |
| tfd | 15029 |

*Figure 2: Tracker contemporaneously transmits contents of "cancer" search to Google.*

95.    Figure 3 shows the user-facing webpage that appears after a user selects a physician from the search results, displaying the physician's profile, biography, and options to contact the provider.



*Figure 3. User view after clicking on Dr. Abbas from "cancer" Name, Condition/Treatment search results.*

96.    Figure 4 depicts the tracking activity that occurs when the physician profile shown in Figure 3 loads. At that time, Tracking Tools embedded in Defendant's Website automatically transmit information about the specific page viewed and the user's interaction and selection, along with unique identifiers, to Google for analytics and advertising purposes.

26



| frm | 0 |
|---|---|
| pscdl | noapi |
| rcb | 10 |
| sr | 739x866 |
| uaa | |
| uab | 64 |
| uafvl | Chromium;148.0.7778.98\|Google%20Chrome;148.0.7778.98\|Not%2FA)Brand;99.0.0.0 |
| uam | Nexus 5 |
| uamb | 1 |
| uap | Android |
| uapv | 6.0 |
| uaw | 0 |
| ul | en-us |
| _s | 1 |
| tag_exp | 0~115616986~115938465~115938468~118012009 |
| sid | 1778791439 |
| sct | 5 |
| seg | 1 |
| dl | https://www.gradyhealth.org/doctors/mohamed-said-awad-abbas/ |
| dr | https://www.gradyhealth.org/doctors/?query=cancer |
| dt | Mohamed Said Awad Abbas, MBBCh \| Atlanta, GA \| Grady Health |
| en | page_view |
| _ee | 1 |
| tfd | 6622 |

***Figure 4. Tracker contemporaneously transmits user's action — Clicking on Dr. Abbas — to Google.***

97.    Similarly, if a patient clicks on the "Get Care Now," button, Defendant's Website prompts the user to select the type of appointment and care for which they are seeking to make an appointment. Meanwhile, the Tracking Tools embedded in Defendant's Website automatically transmit unique identifiers and information reflecting the patient clicked a "Schedule Appointment," button, and the type of appointment and care sought, to Google for analytics and advertising purposes. This disclosure is depicted in Figures 5 and 6 below.



*Figure 5: User view after clicking on "Schedule Appointment" button.*



| sr | 888x866 |
|---|---|
| uaa | |
| uab | 64 |
| uafvl | Chromium;148.0.7778.98\|Google%20Chrome;148.0.7778.98\|Not%2FA)Brand;99.0.0.0 |
| uam | Nexus 5 |
| uamb | 1 |
| uap | Android |
| uapv | 6.0 |
| uaw | 0 |
| ul | en-us |
| _s | 5 |
| tag_exp | 0~115616986~115938465~115938468 |
| dl | https://www.gradyhealth.org/make-an-appointment/?appointment_type=in-person-doctor-visit&care_type=adult-care |
| dr | https://www.gradyhealth.org/make-an-appointment/?appointment_type=in-person-doctor-visit |
| sid | 1778791439 |
| sct | 5 |
| seg | 1 |
| dt | Make Doctor's Appointment Online \| Grady Health |
| en | page_view |
| _et | 997 |
| tfd | 59680 |

*Figure 6: Tracking Tools transmit that the User sought to schedule an in-person appointment for adult care to Google.*

98.    From the page on Figure 5, if the patient selects the "Adult Care" button, Defendant's Website generates a list of providers. If the patient selects a provider from the list generated by the search request, the Tracking Tools embedded in Defendant's Website automatically transmit unique identifiers and information reflecting the specific provider the patient selected to Google for analytics and advertising purposes. This disclosure is depicted in Figures 7 and 8 below.



*Figure 7: User view after clicking on the "Adult Care" button.*

| | |
|---|---|
| uaa | |
| uab | 64 |
| uafvl | Chromium%3B148.0.7778.98%7CGoogle%2520Chrome%3B148.0.7778.98%7CNot%252FA)Brand%3B99.0.0.0 |
| uam | Nexus%205 |
| uamb | 1 |
| uap | Android |
| uapv | 6.0 |
| uaw | 0 |
| ul | en-us |
| tag_exp | 0~115616986~115938465~115938468 |
| sid | 1778791439 |
| sct | 5 |
| seg | 1 |
| dl | https%3A%2F%2Fwww.gradyhealth.org%2Fmake-an-appointment%2F%3Fappointment_type%3Din-person-doctor-visit%26care_type%3Dadult-care%26loc%3Dasa-g-yancey-health-center |
| dr | https%3A%2F%2Fwww.gradyhealth.org%2Fmake-an-appointment%2F%3Fappointment_type%3Din-person-doctor-visit%26care_type%3Dadult-care |
| dt | Make%20Doctor%27s%20Appointment%20Online%20%7C%20Grady%20Health |
| _s | 8 |
| tfd | 128445 |

*Figure 8: Tracking Tools transmit the user's request for and location of treatment to Google.*

99.    Grady's Tracking Tools intercept and disclose to Google and other third parties both the "contents" of individuals' communications on Grady's Website (i.e., the URLs, buttons, links, pages, and tabs they view, and the information entered into the Website's forms) and identifiers that can uniquely identify the patient (i.e., the individuals' IP addresses, cookie identifiers, device identifiers and account numbers).

100.    Once a patient chooses a doctor, all of the information that patient has submitted is automatically sent directly to third parties, including but not limited to

Google. The information transmitted to third parties includes, (i) the patient's search parameters (ii) the fact that the patient clicked on a specific provider's profile page and (iii) whether the patient scheduled an appointment with that provider.

101.    Each time Grady sends this activity data, it also discloses a patient's personally identifiable information alongside the contents of their communications.

102.    Thus, Defendant reveals to Google and other third parties the exact links and pages website users click and view and discloses extensive insight into the user's past, present, and/or future health care, which qualifies as protected health information under HIPAA. *See* 45 C.F.R. § 160.103.

103.    This example highlights just one of the hundreds (if not thousands) of paths on Grady's Website demonstrating how Defendant's Website surreptitiously collects and transmits protected health information to its third-party vendors.

104.    The disclosures described above are taking place without Users' consent.

105.    Thus, without the consent of visitors to its Website, Defendant has effectively used its source code to commandeer Users' computing devices thereby re-directing their Private Information to third parties.

106.    The information Defendant's Tracking Tools send to Google and other third parties may include, among other things, Users' PII, PHI and other confidential information.

107.    Consequently, when Plaintiff and Class Members visit Grady's Website and communicate their Private Information, it is transmitted to Google, and other third parties, including, but not limited to: (i) medical conditions and specialties searched by Users; (ii) the names and profiles of healthcare providers viewed by Users; (iii) facility locations selected or searched by Users; (iv) the content of Users' free-text searches conducted via the Website's search bar; (v) the full-string URLs of pages visited by Users, which encode and reflect the substance of Users' healthcare-related browsing activity; (vi) when Users click a provider's phone number to call for an appointment, which is captured and transmitted as a discrete tracked even; (vii) when Users click to refill a prescription, pay a bill, and view or request medical record(s); (viii) Users' personal identifiers transmitted contemporaneously with the foregoing, including IP addresses and unique cookie identifiers associated with each third-parties' own Tracking Tools. The URLs transmitted to third parties further reflect when Users navigate to pages associated with scheduling appointments, contacting providers, or accessing the patient portal.

**F.    Grady's Tracking Tools Caused Plaintiff's and Class Members' PII and PHI to be Sent to Third Parties.**

108.    Grady utilizes and intentionally installed the Tracking Tools on its Website to secretly track patients by recording their activity and experiences in violation of its contractual, statutory and regulatory duties and obligations.

109.    Grady's Website contains multiple unique identifiers associated with

Google Tracking Tools (including Google DoubleClick and Google Analytics) which indicate that the Tracking Tools are being used on a particular webpage.

111. Together, these Tracking Tools enable Grady to optimize the delivery of ads, measure cross-device conversions, create custom audiences and reduce advertising and marketing costs.

112. However, Grady's Website does not rely on Tracking Tools in order to function.

113. While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Grady via its Website.

114. Grady did not disclose to Plaintiff and Class Members that their Private Information would be shared with third parties as it was communicated to Defendant.

115. Plaintiff and Class Members never consented, agreed, authorized or otherwise permitted Grady to disclose their Private Information to third parties, nor did they intend for third parties to be a party to their communications with Defendant.

116. Grady's Tracking Tools sent non-public Private Information to third parties, including but not limited to Plaintiff's and Class Members': (i) status as medical patients; (ii) health conditions; (iii) sought treatment or therapies; (iv)

appointment requests and appointment booking information; (v) locations or facilities where treatment is sought; (vi) which web pages were viewed and (vii) phrases and search queries conducted via the general search bar.

117. Importantly, the Private Information Defendant's Tracking Tools was transmitted alongside unique identifiers assigned to Plaintiff's and Class Members' devices or browsers, including, but not limited to, IP addresses, Google cookies such as IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique identity.

118. Defendant knowingly and intentionally deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented technology (*i.e.*, the Tracking Tools) that surreptitiously tracked, recorded and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (ii) disclosed patients' protected information to unauthorized third parties and (iii) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

119. Plaintiff never consented, agreed, authorized or otherwise permitted Defendant to disclose her PII and PHI nor did she authorize any assistance with intercepting her communications.

120. Plaintiff was never provided with written notice that Grady disclosed its Website Users' PHI or provided any means of opting out of such disclosures.

121. Despite this, Grady knowingly and intentionally disclosed Plaintiff's PHI to third parties including but not limited to Google.

122. By law, Plaintiff is entitled to privacy in her protected health information and confidential communications.

123. Grady deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented a system that surreptitiously tracked, recorded and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information and protected health information to a third party and (ii) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

## G.    Defendant's Privacy Policy and Promises.

124. During the statutory period, Grady's Notice of Privacy Practices (the "Notice") represented that it ***never*** shares or discloses users' health information for marketing purposes or for the sale of users' information without first obtaining the users' written authorization.[12] Yet, the Notice does not disclose that health-related data is nonetheless shared with third-party advertising and analytics providers,

---

[12] *See* Grady, Notice of Privacy Practices, https://www.gradyhealth.org/wp-content/uploads/Summary-and-Notice-of-Privacy-Practices-Updated-April-2022.pdf.

creating a clear inconsistency between what the policy states and what occurs in practice.[13]

125.   Defendant's Patient Privacy Policy disclosures further represent that information shared for advertising purposes is limited in scope and does not include identifying or health information. Specifically, Defendant states: "While you are a patient here, we will use and disclose your medical information: …[t]o comply with the law[.] We are required by law[] [t]o keep your medical information confidential in accordance with legal requirements…[and] [t]o follow the terms of this notice that is currently in effect."[14] The Privacy Policy  assures users that "[a] visitor can access and browse our entire site at any time without providing any personal information. We do not collect information that would personally identify you unless you choose to provide it. In addition, Grady [] does not share any personally identifiable information of any individual with any third party unrelated to Grady System, except in situations where we must provide information for legal purposes or investigations, or if so directed by the patient through a proper authorization[]"[15] and states, "[o]ur website contains forms through which users may request information or supply feedback to us. In some cases, telephone numbers, e-mail addresses or return addresses are required to process credit card payments…We do not provide any

---

[13] *Id.*

[14] *Id.*

[15] *See* Grady, Privacy Policy, https://www.gradyhealth.org/privacy-security/.

information supplied on our web forms to any outside organization for any reason. We do not save this personal information for any other reason."[16]

126. The Privacy Policy also acknowledges that Defendant uses "first party cookies" on its websites and that "[c]ookies are never associated with specific personal identities. First-party cookies are distinct from third-party cookies [in] that they are created and directly served by the company hosting the website."[17] These disclosures present the use of tracking technologies as limited to analytics and advertising optimization while assuring users that health information and identifying personal data are not shared with advertising partners.

127. These statements are materially misleading in light of Defendant's actual website practices. As set forth herein, Defendant's websites deploy third-party tracking technologies that intercept users' interactions with the website, including pages visited, search parameters, and communications entered into website forms. Those interactions are transmitted together with persistent identifiers such as IP addresses, cookies, and device identifiers to third-party analytics and advertising platforms including, but not limited to, Google.

128. Defendant's privacy disclosures do not adequately inform patients that their interactions with healthcare provider pages, appointment scheduling tools, or

---

[16] *Id.*

[17] *Id.*

other health-related webpages may be transmitted to third-party advertising and analytics companies through tracking technologies embedded on the website. A reasonable user reviewing Defendant's policies would understand that health-related information is not shared with advertising partners and that any marketing-related disclosures are limited to basic technical identifiers.

129. By intercepting and transmitting Plaintiff's and Class Members' interactions together with unique identifiers to third-parties, Defendant disclosed information beyond what its privacy disclosures represented. These transmissions occurred without obtaining the written authorization or informed consent that Defendant's own privacy materials represent is required for marketing uses or disclosures of their Private Information.

**H.    Federal Warning on Tracking Codes on Healthcare Websites.**

130. Beyond Defendant's own policies, the federal government has issued guidance warning that tracking code like the Tracking Tools employed by the Defendant may come up against federal privacy law when installed on healthcare websites.

131. The OCR Bulletin is clear that healthcare organizations regulated under HIPAA may use third-party tracking tools, such as the Defendant's Tracking Tools, in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' protected

39

health information to these vendors. [18]

132.   The Bulletin explains:

Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[19]

133.   The Bulletin discusses the types of harm that disclosure may cause to

the patient:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted***

---

[18] *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 3.
[19] *Id.* (emphasis added).

*or required by the HIPAA Privacy Rule.*[20]

134.   Plaintiff and Class Members face exactly the risks about which the government expresses concern. Defendant has passed along Plaintiff's and Class Members' search terms about health conditions for which they seek doctors; their contacting of doctors to make appointments; the names of their doctors; the frequency with which they take steps relating to obtaining healthcare for certain conditions and where they seek medical treatment.

135.   This information is, as described by the OCR Bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, *or any unique identifying code.*[21]

136.   Crucially, that paragraph in the government's Bulletin continues:

> IIHI [individually identifiable health information] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services… [for example,] if an individual were looking at

---

[20] *Id.* (emphasis added).
[21] *Id.* (emphasis added).

a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, ***the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care.***[22]

137. The OCR Bulletin reminds healthcare organizations regulated under the HIPAA that they may use third-party tracking tools, such as the Google Tracking Tools, only in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.[23]

138. The federal government is taking these violations of health data privacy and security seriously, as recent high-profile FTC settlements against several telehealth companies demonstrate.

139. For example, in 2021 and 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook and Google. The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook

---

[22] *Id.* (emphasis added).
[23] *See id.*

and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing with Facebook, Google and other third parties. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[24]

140.    Even more recently, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of

---

[24] *See FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising, Fed. Trade Comm'n* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising; *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, Fed. Trade Comm'n (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, Fed. Trade Comm'n (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc; *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, Fed. Trade Comm'n (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google.); (last visited May 12, 2026).

technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[25]

141.   This is further evidence that the data that Defendant chose to disclose is protected Private Information, and the disclosure of that information was a violation of Plaintiff's and Class Members' rights.

**I.    Grady's Use of Tracking Technologies Violated HIPAA.**

142.   Grady's disclosure of Plaintiff's and Class Members' Private Information to entities like Google also violated HIPAA.

143.   Under federal law, a healthcare provider may not disclose PII, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[26]

144.   HHS instructs healthcare providers that patient status itself is protected

---

[25] *See Use of Online Tracking Technologies by HIPAA*, *supra* note 3.
[26] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

by HIPAA.

145. HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

146. The Privacy Rule broadly defines protected health information as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

147. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (ii) "the following identifiers of the individual

45

or of relatives, employers, or household members of the individual are removed:

    A.    Names;
        …

    H.    Medical record numbers;

        …

    J.    Account numbers;

        …

    M.    Device identifiers and serial numbers;

    N.    Web Universal Resource Locators (URLs);

    O.    Internet Protocol (IP) address numbers; … and

    P.    Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[27]

148.    The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers like Defendant—to maintain appropriate safeguards to protect the privacy of PHI. The Privacy Rule also sets limits and conditions on the uses and disclosures of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

149.    Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, is considered PHI.

---

[27] *See* 45 C.F.R. § 160.514.

46

150. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[28]

151. Consistent with this restriction, HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[29]

152. Here, as described *supra*, Grady provided patient information to third parties in violation of the Privacy Rule—and its own Privacy Policy. An individual

---

[28] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule,* U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited May 12, 2026).

[29] *Marketing*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited May 12, 2026).

or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320(d)(6).

153.   The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization."  42 U.S.C. § 1320(d)(6).

154.   Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320(d)(6)(b). In such cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both."  42 U.S.C. § 1320(d)(6)(b)(1).

155.  HIPAA also requires Grady to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access

rights," 45 C.F.R. § 164.312(a)(1)—which Grady failed to do.

156.   Under HIPAA, Grady is forbidden to disclose PII about a patient, potential patient or household member of a patient for marketing purposes without the patient's express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

157.   Grady further failed to comply with other HIPAA safeguard regulations as follows:

a)   Failing to ensure the confidentiality and integrity of electronic PHI that Grady created, received, maintained and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b)   Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c)   Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Grady in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d)   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e)   Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3), and

f)   Failing to design, implement and enforce policies and procedures that would establish physical and

administrative safeguards to reasonably safeguard PHI
in violation of 45 C.F.R. section 164.530(c).

158.   In disclosing the content of Plaintiff's and the Class Members' communications, Grady had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions.

159.   Grady's placement of third-party Tracking Tools on its Website is a violation of Plaintiff's and Class Members' privacy rights under federal law. While Plaintiff does not bring a claim under HIPAA itself, this violation demonstrates Grady's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

## J.   Plaintiff's and Class Members' Private Information Has Substantial Financial Value.

160.   Plaintiff and Class Members' Private Information has substantial value. Grady's disclosure and interception harmed Plaintiff and the Class Members by not compensating them for the value of their Private Information and diminishing the value of their Private Information.

161.   The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the technology economy.

162.   Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single

50

piece of information that may be found in a financial breach.

163. Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, the damage caused can be irreparable.

164. The value of health data is well-known, and various reports have been conducted to identify its value.

165. Specifically, in 2023, the Value Examiner published a report titled "Valuing Healthcare Data." The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[30]

166. Trustwave Global Security published a report entitled "The Value of Data." With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next-

---

[30] *See Valuing Healthcare Data* (white paper), Health Capital (Dec. 2017), https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf.

highest-value record (a payment card).[31]

167. The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[32]

168. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[33]

169. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold evidences the value of PHI.

170. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell

---

[31] *See Healthcare Data: The New Prize for Hackers*, Imprivata (Nov. 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers.

[32] *See* Alice Park & Brian Everstine, *How the Medical-Data Industry Sells Your Records — and Why Doctors Can't Stop It*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

[33] *See* Lauren Hirsch, *Hospital Execs Say They're Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

other Internet users' stolen data, surely Internet users can sell their own data.

171.  Google's and others' practices of using such information to package groups of people as "Lookalike Audiences"[34] and similar groups and selling those packages to advertising clients demonstrates the financial worth of that data.

172.  Data harvesting is the fastest growing industry in the nation.

173.  As software, data mining and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

174.  Consumer data is so valuable that some have proclaimed that data is the new oil.

175.  Between 2016 and 2018, the value of information mined from Americans increased by 85% for Facebook and 40% for Google.

176.   Overall, the value internet companies derive from Americans' personal data increased almost 54% and is only expected to continue growing in the coming years.

177.  Conservative estimates suggest that in 2018, Internet companies earned $202 per American user. By 2020, that value had jumped to approximately $420 per

---

[34]   *Lookalike audiences*, Display & Video 360 Help, https://support.google.com/displayvideo/answer/15612398?hl=en (last visited May 12, 2026) ("Lookalike audiences are groups of people that share characteristics with others on an existing 'seed' list … find other potential customers with similar characteristics").

adult American user each year, making personal data sales a nearly $140 million industry.[35]

178.    In 2025, the global big data market was projected to be valued at approximately $224.46 billion.[36]

179.    As to health data specifically, as detailed in an article in Canada's National Post:

> As part of the multibillion-dollar worldwide data brokerage industry, health data is one of the most sought-after commodities. De-identified data can be re identified (citing https://www.nature.com/articles/s41467-019-10933-3/ ) and brazen decisions to release records with identifiable information (citing https://www.wsj.com/articles/hospitals-give-tech-giants-access-todetailed-medical-records-11579516200?mod=hp_lista_pos3 ) are becoming commonplace).[37]

180.    Further demonstrating the financial value of Class Members' medical data, CNBC has reported that hospital executives have received a growing number

---

[35]    Pawtocol, *How Much Is User Data Worth?*, Medium (Mar. 16, 2020), https://pawtocol.medium.com/how-much-is-user-data-worth-f2b1b0432136.

[36] Market Data Forecast, *Big Data Market Size, Share, Trends & Analysis, 2033* (Sept. 25, 2025), https://www.marketdataforecast.com/market-reports/big-data-market (projecting the global big data market to grow from a 2024 value of USD 199.63 billion to an estimated USD 224.46 billion in 2025).

[37] *See* Iris Kulbatski, *The Dangers of Electronic Health Records*, National Post (Feb. 26, 2020), https://nationalpost.com/opinion/iris-kulbatski-the-dangers-of-electronic-health-records.

of bids for user data:

>Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."

* * *

>[H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health premiums, or to target advertising to individuals.[38]

181.   The CNBC article also explained:

>De-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQVIA, said on its website that it has access to more than 600 million patient records globally that are nonidentified, much of which it accesses through provider organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial

---

[38] *See* Lauren Hirsch, *Hospital Execs Say They're Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

recruiting But hospital execs worry that this data may be used in unintended ways, and not always in the patient's best interest.

182.   Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own needs. For instance, the health data Google collects could eventually help it micro-target advertisements to people with particular health conditions. Policymakers are proactively calling for a revision and potential upgrade of the health privacy rules known as HIPAA, out of concern for what might happen as tech companies continue to march into the medical sector.[39]

183.   Time Magazine similarly, in an article titled, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, referenced the "growth of the big health data bazaar," in which patients' health information is sold. It reported that:

> [T]he secondary market in information unrelated to a patient's direct treatment poses growing risks, privacy experts say. That's because clues in anonymized patient dossiers make it possible for outsiders to determine your identity, especially as computing power advances in the future.[40]

184.   This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has

---

[39] *Id.*

[40] *See* Alice Park & Brian Everstine, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[41]

185. There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

186. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

187. Grady gave away Plaintiff's and Class Members' communications and transactions on its Website without permission.

188. The unauthorized access to Plaintiff's and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website Users, including Plaintiff and Class Members.

189. Plaintiff has a continuing interest in ensuring that her future communications with Grady are protected and safeguarded from future unauthorized disclosure.

**K.    Defendant Violated Industry Standards.**

---

[41] S*ee 10 Apps for Selling Your Data for Cash,* WalletHacks, https://wallethacks.com/apps-for-selling-your-data/ (last visited May 12, 2026).

190. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship, it is a cardinal rule.

191. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

192. AMA Code of Ethics Opinion 3.1.1 provides that "[p]rotecting information gathered in association with the care of the patient is a core value in health care…. Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

193. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

194. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the

58

care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[42]

## L.  Users' Reasonable Expectation of Privacy.

195.  Plaintiff and Class Members were aware of Grady's duty and assurances of confidentiality when they sought medical services from Defendant.

196.  Indeed, when Plaintiff and Class Members provided their PII/PHI to Grady, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

197.  Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

198.  For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a

---

[42] Am. Med. Ass'n, *Code of Medical Ethics ch. 3*, https://policysearch.ama-assn.org/policyfinder/detail/data%20integrity?uri=%2FAMADoc%2FEthics.xml-E-3.3.2.xml (last visited May 12, 2026).

complete list of the data that is collected about them.[43]

199. Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class Members.

200. Plaintiff's and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Grady's status as a healthcare provider, Defendant's obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendant's express promises of confidentiality.

**M.  Unique Personal Identifiers, including IP Addresses, are Protected Health Information.**

201. While not all entities are covered under HIPAA, the law specifically applies to healthcare providers, health insurance providers and healthcare data clearinghouses.[44]

---

[43] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds,* Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

[44] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook,* The Markup (June 21, 2022), https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other

202. The HIPAA Privacy Rule sets forth policies to protect all individually identifiable health information that is held or transmitted.

203. HIPAA identifies at least 18 categories of identifiers that render health information individually identifiable when maintained by or disclosed from a covered entity. Such identifiers constitute protected health information when they identify an individual or when the covered entity has actual knowledge that the information can be used alone or in combination with other information to identify an individual. *See* 45 C.F.R. § 164.514(b)(2)(i).

204. These HIPAA Identifiers, as relevant here, include names, dates related to an individual, email addresses, device identifiers, web URLs and IP addresses.[45]

205. Grady unlawfully disclosed Plaintiff's and Class Members' HIPAA identifiers, including their names, emails, dates they sought treatments, computer IP addresses, device identifiers and web URLs visited to third parties through their use of the Tracking Tools *in addition to* services selected, patient statuses, medical conditions, treatments, provider information and appointment information.

206. HIPAA further declares information as personally identifiable where

---

identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations").

[45] U.S. Dep't of Health & Hum. Servs., *Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited May 12, 2026).

the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

207. In addition to patient status, medical conditions, treatment, specific providers, and appointment information, Grady improperly disclosed patients' computer IP addresses to third parties like Google through the use of Tracking Tools.

208. An IP address is a number that identifies the address of a device connected to the Internet.

209. IP addresses are used to identify and route communications on the Internet.

210. IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

211. Under HIPAA, an IP address is considered personally identifiable information.

212. HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

213. Consequently, Grady's disclosure of patients' IP addresses violated

HIPAA and industry-wide privacy standards.

214. In addition to the substantive health-related information described above, Grady disclosed to Google and other third parties a series of *unique identifying codes* associated with Plaintiff's and Class Members' website interactions, including persistent cookie identifiers, device identifiers, and other tracking IDs assigned by Google's tracking technologies.

215. These unique identifying codes include, among others, Google advertising and analytics cookies such as IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, which function as persistent identifiers that allow these third party vendors to distinguish, recognize, and track a specific individual or device across browsing sessions and across websites.

216. Under HIPAA, "individually identifiable health information" expressly includes not only traditional identifiers like names or medical record numbers, but also "any other unique identifying number, characteristic, or code" that can be used to identify an individual or for which there is a reasonable basis to believe the information can be used to identify the individual. 45 C.F.R. § 160.103; 45 C.F.R. § 164.514(b)(2)(i).

217. HIPAA's de-identification rule makes clear that information is *not* de-identified if it includes device identifiers, IP addresses, URLs, or other unique identifying codes, or if the covered entity has actual knowledge that the information

could be used—alone or in combination with other information—to identify an individual. 45 C.F.R. § 164.514(b)(2).

218.   Grady knowingly disclosed these unique identifying codes alongside URLs, page content, search terms, and other communications that directly reflect an individual's interest in, pursuit of, or receipt of healthcare services, thereby allowing third parties to link those health-related communications to a specific, identifiable patient.

219.   Because these unique identifying codes were transmitted together with information relating to an individual's health conditions, providers, appointments, or treatment inquiries, they constitute individually identifiable health information— and therefore protected health information—under HIPAA.

220.   Grady's disclosure of these unique identifying codes to third parties was not incidental, anonymous, or de-identified, but instead enabled ongoing recognition, profiling, and re-identification of Plaintiff and Class Members in connection with their healthcare activities, in direct contravention of HIPAA's privacy and de-identification requirements.

**N.    Defendant was Enriched and Benefitted from the Use of Tracking Tools and Unauthorized Disclosures.**

221.   Grady intentionally deployed and configured the Tracking Tools on its Website to disclose patients' Private Information to third parties for marketing, commercial advantage, and profit, benefits Grady could obtain only through the

knowing disclosure of that Private Information.

222. In exchange for disclosing the Personal Information of its patients, Grady is compensated by third party vendors like Google in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

223. After receiving individually identifiable patient health information communicated on the Grady Website, third party vendors forward this data, and its analysis of this data, to Defendant.

224. Grady then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Website.

225. Grady also receives an additional commercial benefit from using third party Tracking Tools, such as the Google DoubleClick, namely being able to serve more targeted advertisements to existing and prospective patients on their Google accounts.

226. Google advertises its Tracking Tools as follows: "when you visit a website that uses [our] advertising services … your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may use the IP address, for example, to identify your general location, to measure the effectiveness of ads, and, depending on your settings, to

improve the relevance of the ads you see. We may also set cookies on your browser or read cookies that are already there."[46]

227. Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. In particular, retargeting operates through code and tracking technology placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[47]

228. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a healthcare website back to Google via the Tracking Technologies and the tag embedded on, in this case, Grady's Website. For example, when a User searches for doctors, medical conditions or treatment on Grady's Website, that information is sent to Google Ads via the conversion tracking tag and associated cookies. Google can then use its data on the User to find more users to click on a Grady ad and ensure that those users targeted are more likely to convert.[48]

---

[46] *How Google uses information from sites or apps that use our services*, Privacy & Terms, *https://policies.google.com/technologies/partner-sites* (last visited May 12, 2026).

[47] The Complex World of Healthcare Retargeting, Medico Digital (July 10, 2023), https://www.medicodigital.com/insights/the-complicated-world-of-healthcare-retargeting/ (last visited May 12, 2026).

[48] *See,* WordStream, *How Does Google Remarketing Work?* (explaining that placing Google remarketing code or tag on a website allows advertisers to add visitors to remarketing audiences via browser cookies and then serve targeted Google Ads to

229.   Through this process, the Google Tracking Tools embedded on Grady's Website record and transmit information about a User's activity when the User loads and interacts with the Website. As Google explains, when a User completes or triggers a defined action on a website, the Google tag or conversion tracking code reads existing cookies and sends information about the page visited and the action taken back to Google for advertising and measurement purposes. The data transmitted includes the URLs of pages visited and the specific actions taken on the website, which, in the healthcare context, may reflect an individual's interest in or pursuit of medical services.[49]

230.   Plaintiff's and Class Members' Private Information have considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

## REPRESENTATIVE PLAINTIFF MICHELLE WILLIAMSON'S EXPERIENCES

231.   As a condition of receiving Grady's services, Plaintiff Michelle Williamson disclosed Private Information to Grady on numerous occasions, most recently in March 2026.

---

those visitors as they browse other sites to increase conversions), https://www.wordstream.com/google-remarketing (last visited May 12, 2026).

[49] *Id*.

232. Ms. Williamson accessed Grady's Website on her computer to receive healthcare services from Defendant and at Defendant's direction.

233. During the relevant time period, when the Defendant's Tracking Tools were present, Ms. Williamson used Grady's website, https://www.gradyhealth.org/, to schedule appointments, research providers and login to MyChart. The full scope of Grady's interceptions and disclosures of Ms. Williamson's communications to third parties, including but not limited to Google, can only be determined through formal discovery. However, Grady intercepted and disclosed at least the following communications about Ms. Williamson's prospective healthcare. The following long-URLs or substantially similar URLs were transmitted to third parties via Tracking Tools:

- https://www.gradyhealth.org/make-an-appointment/?appointment_type=in-person-doctor-visit
- https://www.gradyhealth.org/make-an-appointment/?appointment_type=in-person-doctor-visit&care_type=adult-care&loc=grady-memorial-hospital
- https://www.gradyhealth.org/services/
- https://www.gradyhealth.org/services/speciality-care/
- https://www.google-analytics.com/g/collect?v=2&tid=G-G71C5E9GLC&gtm=45je65i2v894346971za20gzb810617463zd810617463&_p=1779225084848&gcd=13l3l3l3l1111&npa=0&dma=0&_eu=AAgAAAQC&_prs=gs&are=1&cid=1456814052.1779224883&frm=0&pscdl=noapi&rcb=3&sr=1280x720&uaa=x86&uab=64&uafvl=Chromium%3B148.0.7778.168%7CGoogle%2520Chrome%3B148.0.7778.168%7CNot%252FA)Brand%3B99.0.0.0&uam=&uamb=0&uap=Windows&uapv=19.0.0&uaw=0&ul=en-us&_s=8&tag_exp=0~115938465~115938468~118131809&cu=USD&sid=1779224883&sct=1&seg=1&dl=https%3A%2F%2Fwww.grady

68

health.org%2Fmake-an-
appointment%2F&dr=https%3A%2F%2Fwww.gradyhealth.org%2F&
dt=Make%20Doctor%27s%20Appointment%20Online%20%7C%20
Grady%20Health&en=make_appointment_page_load&_c=1&ep.even
t_category=layout--two-
col&ep.event_action=click&ep.event_label=LogintoMyChart&ep.pag
e_url=https%3A%2F%2Fwww.gradyhealth.org%2Fmake-an-
appointment%2F&epn.value=200&_et=1&tfd=5579

- https://www.google-analytics.com/g/collect?v=2&tid=G-
G71C5E9GLC&gtm=45je65e0v894346971z8810617463za200zd894
346971&_p=1779134629547&gcd=13l3l3l3l111&npa=0&dma=0&_e
u=AAAAAAQC&are=1&cid=2125781418.1778791675&frm=0&psc
dl=noapi&rcb=5&sr=1440x900&uaa=x86&uab=64&uafvl=Chromiu
m%3B148.0.7778.168%7CGoogle%2520Chrome%3B148.0.7778.168
%7CNot%252FA)Brand%3B99.0.0.0&uam=&uamb=0&uap=macOS
&uapv=14.8.3&uaw=0&ul=en-
us&_s=3&tag_exp=0~115938466~115938469~117227716&sid=1779
133980&sct=4&seg=1&dl=https%3A%2F%2Fwww.gradyhealth.org
%2Fdoctors%2F&dr=https%3A%2F%2Fwww.gradyhealth.org%2Fse
rvices%2Fspeciality-
care%2F&dt=Find%20a%20Doctor%20%7C%20Grady%20Health&e
n=component_link_click&ep.event_category=find-a-doctor-
stage&ep.event_action=click&ep.event_label=Gastroenterology&ep.p
age_url=https%3A%2F%2Fwww.gradyhealth.org%2Fdoctors%2F&_
et=5641&tfd=14084

- https://www.gradyhealth.org/doctors/kimmarie-n-ross-dnp-msn-fnp-c/

235. Contemporaneously with its interception and transmission of Ms. Williamson's communications on *https://www.gradyhealth.org/*, Grady also disclosed to third parties Ms. Williamson's personal identifiers, including but not limited to her IP addresses, cookie identifiers, device identifiers and account numbers.

236.    Grady never notified Ms. Williamson that it and third parties would put individually identifiable patient health information about her past, present, or future health conditions to their own commercial uses. Ms. Williamson never provided informed consent or written permission allowing Grady to send individually identifiable patient health information about her past, present, or future health conditions to third parties. Ms. Williamson never provided informed consent or written permission allowing Grady or any third party to put individually identifiable patient health information about her past, present, or future health conditions to their own commercial use.

237.    Google maintains records of the advertisements it serves to individual users and their devices. Ms. Williamson will seek in discovery the records reflecting the ads related to her medical conditions and treatments that were delivered to her and the Class Members, along with associated targeting and delivery data, to fully inform the scope of their claims and damages and the ways in which their Private Information was used for advertising.

238.    Ms. Williamson provided Private Information to Grady and trusted that the information would be safeguarded according to Grady's policies and state and federal law.

239.    Ms. Williamson reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Grady, and

70

that such communications would not be transmitted to or intercepted by a third party.

240. By doing so without her consent, Grady breached its Notice of Privacy Practices and Privacy Policy and unlawfully disclosed Ms. Williamson's Private Information.

241. Plaintiff Williamson suffered damages in form of (i) invasion of privacy; (ii) diminution of value of her Private Information; (iii) statutory damages and (iv) the continued and ongoing risk to her Private Information.

242. Plaintiff Williamson has a continuing interest in ensuring that her Private Information, which remains in Grady's possession, is protected and safeguarded from future unauthorized disclosure.

## TOLLING

243. Any statute of limitations applicable to Plaintiff's claims have been tolled by Grady's actual knowledge and efforts to conceal the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and the Class Members had no obvious way to discover Grady's deception and unlawful conduct.

244. Plaintiff and the Class Members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Grady was acting unlawfully. The earliest Plaintiff or a reasonable user of Grady's Website could have learned of Grady's conduct was approximately April 2026, when

71

Plaintiff's counsel, through an independent technical investigation, identified Tracking Tools operating on Grady's Website and transmitting user healthcare communications and identifiers to third parties. Grady's alleged representations were material to Plaintiff and the Class Members at all relevant times. Before the expiration of any applicable statute of limitations period, Plaintiff and the Class Members could not have discovered Defendant's wrongful conduct through the exercise of reasonable diligence because Grady's incorporation of the Tracking Tools is highly technical, undiscoverable by ordinary users of Grady's Website, and Defendant made no disclosures or other indications that would inform a reasonable user of its Website that Grady intercepting and disclosing Users' individually-identifiable health information to third parties.

245.   At all relevant times, Grady was—and still is—under a continuous duty to disclose to Plaintiff and the Class Members the true nature of the disclosures being made and the lack of an actual "requirement" before it shares Plaintiff's and the Class Members' data with third parties, including but not limited to, Google.

246.   Grady knowingly, actively, affirmatively or negligently concealed the facts alleged herein.

247.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Grady's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

**CLASS ACTION ALLEGATIONS**

248.   Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated (the "Class") pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

249.   The Class that Plaintiff seeks to represent is defined as follows:

> All people who used Grady's Website and who had individually-identifiable patient health information about their past, present, or future health conditions disclosed or transmitted to Google or any other unauthorized third party.

250.   Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries; any entity in which Defendant has a controlling interest; any Defendant officer or director, any successor or assign; Defendant's and Plaintiff's attorneys in this action, their staff and immediate family; and any Judge who adjudicates this case, including their staff and immediate family.

251.   Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

252.   This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(1), because the Class Members are so numerous and geographically dispersed that their joinder would be impracticable. Plaintiff believes that the business records of Grady, Google will permit the identification of thousands of people meeting the Class definition.

253. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(2), because there are many common questions of facts and law concerning and affecting the Class Members, including:

a. Whether Grady had a duty to protect and refrain from disclosing the Class Members' individually identifiable health information;

b. Whether Grady intentionally disclosed the Class Members' individually identifiable health information to third parties including but not limited to Google;

c. Whether the Class Members consented to Grady disclosure of their individually identifiable health information to third parties, including but not limited to Google;

d. Whether the Class Members are entitled to damages because of Grady's conduct; and

e. Whether Grady's knowing disclosure of its patients' individually identifiable health information to third parties, including but not limited to Google is "criminal or tortious" under 18 U.S.C. § 2511(2)(d).

254. Plaintiff also anticipates that Defendant will raise defenses common to the Class.

255. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(3), because Plaintiff's claims are typical of the claims belonging to the Class Members. Plaintiff and the Class Members were harmed by the same wrongful conduct perpetrated by Grady that caused their individually identifiable health information to be intercepted and disclosed without notice or consent. As a result, Plaintiff's claims are based on the same facts and legal theories as the Class

74

Members' claims.

256. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(4), because Plaintiff will fairly and adequately protect the interests of all the Class Members, there are no known conflicts of interest between Plaintiff and the Class Members, and Plaintiff has retained counsel experienced in the prosecution of complex litigation.

257. Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), because common questions of law and fact predominate over questions affecting the individual Class Members, because a class action is superior to other available methods for the fair and efficient adjudication of these claims and because important public interests will be served by addressing the matter as a class action. Further, the prosecution of separate actions by the individual Class Members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant and substantially impair the Class Members' ability to protect their interests.

258. The State of Georgia has a significant interest in regulating the conduct of businesses operating within its borders.

259. Georgia, which seeks to protect the rights and interests of Georgia and all residents and citizens of the United States against a company headquartered and doing business in Georgia, has a greater interest in the claims of Plaintiff and the

Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

260. The principal place of business and headquarters of Grady, located in Georgia, is the "nerve center" of its business activities—the place where its high-level officers direct, control and coordinate its activities, including major policy, financial and legal decisions.

261. Grady's actions and corporate decisions surrounding the allegations made in the Complaint were made from and in Georgia.

262. Grady's breaches of duty to Plaintiff and Class Members emanated from Georgia.

263. Application of Georgia law to the Class with respect to Plaintiff's and the Class Members' common law claims is neither arbitrary nor fundamentally unfair because, further to choice of law principles applicable to this action, the common law of Georgia applies to the nationwide common law claims of all Class Members. Additionally, given Georgia's significant interest in regulating the conduct of businesses operating within its borders, and that Georgia has the most significant relationship to Grady, as it is headquartered in Georgia, there is no conflict in applying Georgia law to non-resident consumers such as Plaintiff and Class Members. Alternatively, and/or in addition to Georgia law, the laws set forth below apply to the conduct described herein.

**COUNT I**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2510, *et seq.***

264. Plaintiff incorporates the allegations contained in paragraphs 1-263 as if fully set forth herein.

265. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

266. The ECPA protects both the sending and receipt of communications.

267. The ECPA provides a private right of action to any person whose wire or electronic communications are intercepted. 18 U.S.C. § 2520(a).

268. Grady intentionally intercepted electronic communications that Plaintiff and the Class Members exchanged with Defendant through Tracking Tools installed on Grady's Website.

269. The transmissions of data between Plaintiff and the Class Members and Grady qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

270. Grady contemporaneously intercepted and transmitted Plaintiff's and the Class Members' communications to third parties, including but not limited to Google.

271. The intercepted communications include:

   a. The content of Plaintiff's and the Class Members' communications relating to appointments with medical providers;

77

b. The content of Plaintiff's and the Class Members' communications relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, prescription drugs, symptoms, insurance, and payment information;

c. Button/menu selections and/or content typed into free text boxes; and

d. Full-string URLs that contain any information concerning the substance, purport, or meaning of patient communications with their health entities.

272. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Grady and third parties, including but not limited to, Google, use to track Plaintiff's and the Class Members' communications;

b. Plaintiff's and the Class Members' browsers;

c. Plaintiff's and the Class Members' computing devices, including desktop computers, laptop computers, tablets and smartphones;

d. Grady's web-servers or webpages where Tracking Tools are present;

e. Google's web-servers; and

f. The Google's analytics scripts embedded in Grady's Website, which intercept and transmit Plaintiff's and the Class Members' communications to third parties.

273.    Google and other third parties are not parties to Plaintiff's and the Class Members' communications with Grady.

274.    Grady transmits the content of Plaintiff's and the Class Members' communications to third parties, including but not limited to, Google through the surreptitious redirection of those communications from Plaintiff's and the Class Members' computing devices.

275.    Plaintiff and the Class Members did not consent to third parties' acquisition of their appointment and treatment communications with Grady.

276.    Third parties like Google did not obtain legal authorization to obtain Plaintiff's and the Class Members' communications with Grady relating to communications with their health entities.

277.    Google did not require Grady to obtain the lawful rights to share the content of Plaintiff's and the Class Members' communications relating to appointments and treatments.

278.    Any purported consent that Google received from Grady to obtain the content of Plaintiff's and the Class Members' communications was not valid.

279.    In disclosing the content of Plaintiff's and the Class Members' communications relating to treatments, conditions and appointments, Grady had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions, as follows:

a.  The unauthorized disclosure of individually identifiable health information is tortuous in and of itself, regardless of whether the means deployed to disclose the information violates the ECPA or any subsequent purpose or use for the acquisition. Grady intentionally committed a tortious act by disclosing individually identifiable health information without authorization to do so.

b.  The unauthorized acquisition of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6, regardless of any subsequent purpose or use of the individually identifiable health information. Grady intentionally violated 42 U.S.C. 1320d-6 by intentionally disclosing individually identifiable health information without authorization.

c.  A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, is a crime punishable by fine or imprisonment with *increased penalties* where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain." Grady intentionally violated the enhanced penalty provision of 42 U.S.C. § 1320d-6 by disclosing the individually identifiable health information "with intent to sell transfer or use" it for "commercial advantage [or] personal gain."

d.  Trespass upon Plaintiff's and the Class Members' personal and private property via the placement of the Tracking Tools on Plaintiff's and the Class Members' personal computing devices is tortious.

e.  Grady's affirmative misrepresentations to Users through its Notice, which falsely assured Users that third-party cookies were not used for tracking purposes despite the simultaneous deployment of third-party tracking technologies, further evidencing Grady's intent to conceal its unauthorized disclosures and to

80

deprive Users of the opportunity to make informed decisions regarding their Private Information.

280. Grady's intent to disclose Plaintiff's and Class Members' Private Information to Google and other third parties existed before each interception because Grady affirmatively chose to deploy, configure, and maintain Tracking Tools on its Website that were designed to capture and transmit patient communications for Grady's marketing, commercial advantage, and profit.

281. To the extent Grady contends it was a party to the communications at issue, the party exception in 18 U.S.C. § 2511(2)(d) does not bar liability because Grady intercepted Plaintiff's and Class Members' communications for the purpose of committing criminal and tortious acts, including knowingly disclosing individually identifiable health information to third parties in violation of 42 U.S.C. § 1320d-6(a)(3), and doing so for commercial advantage and personal gain.

282. Plaintiff's and Class Members' information that Grady disclosed to third parties qualifies as individually identifiable health information, and Defendant violated Plaintiff's expectations of privacy, which constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6). Grady intentionally used the wire or electronic communications to increase its profit margins. Grady specifically used the Tracking Tools and other codes to track and utilize Plaintiff's and Class Members' Private Information for its own financial benefit.

283.  Plaintiff and Class Members did not authorize Grady to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via Tracking Tools. Plaintiff and Class Members had a reasonable expectation that Grady would not re-direct their communications content others attached to their personal identifiers in the absence of their knowledge or consent.

284.  Any purported consent that Grady received from Plaintiff and Class Members was not valid.

285.  Grady's scheme or artifice to defraud in this action further consists of the false and misleading statements and omissions in its privacy policies set forth above.

286.  Grady acted with the intent to defraud in that it willfully invaded Plaintiff's and the Class Members' property rights, including their:

    a.  Property right to the confidentiality of their Private Information, their right to determine whether such information remains confidential and their exclusive right to determine who may collect and/or use such information for marketing purposes; and

    b.  Property right to determine who has access to their computing devices.

287.  Grady acted with the intent to defraud in that it willfully invaded and took Plaintiff's and the Class Members' property:

    a.  With knowledge that (1) Grady did not have the right to share Private Information without written authorization; (2) courts have determined that a

82

healthcare providers' use of similar Tracking Tools gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable user would not understand that Google and other third party vendors were collecting their Private Information based on their activities on Grady's Website; and (4) the subsequent use of health information for advertising was a further invasion of Plaintiff's and Class Members property rights to make exclusive use of their individually-identifiable health information for any purpose not related to the provision of their healthcare.

b.  With the intent to (1) acquire Plaintiff's and the Class Members' individually identifiable health information without their authorization and without their healthcare providers or covered entities obtaining the right to share such information; and (2) use Plaintiff's and the Class Members' individually-identifiable health information without their authorization.

288.  Plaintiff and the Class Members have suffered damages because of Grady's violations of the ECPA that include:

a.  Grady eroded the essential, confidential nature of the provider-patient relationship;

b.  Grady failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information;

c.  Grady derived valuable benefits from using and sharing the contents of Plaintiff's and the Class Members' communications on its Website without their knowledge or informed consent, and without providing any compensation for the information it used or shared;

83

d. Grady's actions deprived Plaintiff and the Class Members of the value of their individually identifiable health information;

e. Grady's actions diminished the value of Plaintiff's and the Class Members' property rights in their individually identifiable health information; and

f. violating Plaintiff's and the Class Members' privacy rights by sharing their individually identifiable health information for commercial use.

289. For Grady's violations set forth above, Plaintiff and the Class Members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Grady] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

290. Unless enjoined, Grady may continue to commit the violations of law alleged here.

291. Plaintiff wants to continue to communicate with her healthcare providers through online platforms but has no practical way of knowing if her communications are being intercepted and disclosed to Google and other third parties and thus continues to be at risk of harm from Defendant's conduct.

292. Pursuant to 18 U.S.C. § 2520, Plaintiff and the Class Members seek monetary damages for the *greater of* (i) the sum of the actual damages suffered by

the Plaintiff and any profits made by Grady as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

## COUNT II
## UNJUST ENRICHMENT

293.   Plaintiff re-alleges and incorporates by reference paragraphs 1-263 as if fully set forth herein.

294.   Defendant Grady benefits from Plaintiff and Class Members and unjustly retained those benefits at their expense.

295.   Plaintiff and Class Members conferred a benefit upon Defendant Grady in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible and other benefits, including substantial monetary compensation.

296.   That is, in exchange for disclosing the PII of its patients, Defendant is compensated by Google in the form of enhanced advertising services and more cost-efficient marketing on Google platforms. By utilizing the Google's Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

297.   Plaintiff and the Class Members provided their Private Information to Grady in reliance on Grady's privacy representations that it would not disclose their health information or personally identifiable information to third parties for

85

marketing or other unauthorized purposes. Plaintiff and Class Members did not intend to confer the advertising, analytics, retargeting, or other commercial benefits that Grady obtained through the unauthorized disclosure of their Private Information.

298. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

299. The benefits that Defendant Grady derived from Plaintiff and Class Members were not offered by Plaintiff and Class Member gratuitously and rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Georgia for Defendant to be permitted to retain any of the revenue or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

300. Defendant Grady should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Williamson on behalf of herself and all those similarly situated, respectfully prays for judgment in her favor and against Defendant

Grady as follows:

- For an Order certifying this action as a class action and appointing Plaintiff Michelle Williamson as Class Representative and Plaintiff's counsel as Class Counsel;

- For equitable relief enjoining Grady from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and other Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and other Class Members;

- For equitable relief compelling Grady to utilize appropriate methods and policies with respect to consumer data collection, storage and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

- For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Grady's wrongful conduct;

- For an award of actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined as allowable by law;

- For an award of punitive damages as allowable by law;

- For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

- Pre- and post-judgment interest on any amounts awarded; and

- All such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Date: May 20, 2026                    Respectfully submitted,

                                                         */s/ MaryBeth V. Gibson*

                                                          MaryBeth V. Gibson
GA Bar No. 725843
**Gibson Consumer Law Group, LLC**
4279 Roswell Road
Suite 208-108
Atlanta, GA  30342
Telephone: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

James B. Zouras (*pro hac vice* forthcoming)
Ryan F. Stephan (*pro hac vice* forthcoming)
Michael J. Casas (*pro hac vice* forthcoming)
**STEPHAN ZOURAS, LLC**
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
Firm ID: 43734
jzouras@stephanzouras.com
rstephan@stephanzouras.com
mcasas@stephanzouras.com

*Attorneys for Plaintiff and the Putative Class*